**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Joshua R. Wilner (State Bar No. 353949)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ndeckant@bursor.com
jwilner@bursor.com
jglatt@bursor.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RICHARD LEE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PLEX, INC. and PLEX GMBH,<br><br>Defendants. | Case No. 5:24-cv-02386-PCP<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Richard Lee ("Plaintiff") brings this action on behalf of himself, and all others similarly situated, against Plex, Inc. and Plex GmbH (together, "Defendants" or "Plex"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Defendants offer TV, video, and movie streaming through their "Plex" streaming service.

2. Plex has installed "tracking pixels" on its website, watch.plex.tv.[1] These tracking pixels secretly and surreptitiously sends consumers' viewing activities to third-party providers like Meta Platforms, Inc. ("Meta" or "Facebook") without consent, in violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C § 2710, *et seq.,* and California Civil Code § 1799.3.

3. Congress has recognized that "films are the intellectual vitamins that fuel the growth of individual thought." S. Rep. No. 100-599, at 7 (Oct. 21, 1988) (citing Senate Judiciary Subcommittee on Technology and the Law, Hearing Tr. At 10 (Aug. 3, 1988)). Indeed, the videos people watch can often reveal their private politics, religious views, or sexuality—in other words, their most personal and intimate details. *Id*. In enacting the VPPA, Congress decided that this intimate information "should be protected from the disruptive intrusion of a roving eye." *Id*.

4. The VPPA was meant to give consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id*.

5. Plex consumers expect a movie night in the privacy of their own homes; they do not expect to have their viewing activities recorded and sent to third parties through the use of tracking

[1] Plex, Inc. can also be accessed via an app. Discovery may demonstrate that Defendants also committed violations of the laws alleged herein on its app. Plaintiff reserves the right to modify the class definition in response to this information.

pixels. However, and unfortunately for Plex consumers, Plex violated the VPPA and California Civil Code Section 1799.3 by knowingly disclosing personal information ("PI") and personally identifiable information ("PII")—including the names of specific videos and video services Plaintiff and Class Members requested and obtained—to Meta without their consent. Specifically, Plex installed computer code on its website called the "Meta Tracking Pixel," which tracks and records Plaintiff and Class Members' private video consumption. Behind the scenes of many key plex.tv webpages—and unbeknownst to video viewers—this code collects Plaintiff and Class Members' video-consumption history and discloses it to Meta without their consent. Meta, in turn, uses Plaintiff and Class Members' video consumption habits to build profiles on consumers and deliver targeted advertisements to them, among other activities.

## PARTIES

6. Plaintiff Richard Lee is, and has been at all relevant times, a citizen of California who resides in San Jose, California. Mr. Lee signed up for Plex's subscription video service and continues to maintain a paid subscription to the site. He has visited the Plex website to watch videos using the same web browser he uses to access his facebok.com account, which exists using his real name. Plaintiff Lee subscribed to Plex's streaming service in 2020 and continued to watch videos on the service until as recently as April 2024.

7. Defendant Plex, Inc. is a Delaware corporation with its principal place of business at 449 North Santa Cruz Avenue, Los Gatos, CA. Together with Plex GmbH, Defendant Plex, Inc. offers the interactive Plex streaming service throughout California and the United States.

8. Defendant Plex GmbH is a Swiss corporation with its principal place of business at Wilhelmine-Gemberg-Weg 6 10179 Berlin, Germany. Plex GmbH oversees and controls the operations of Plex, Inc., and relies on its subsidiary, Plex, Inc., for access into, and delivery of video content and the sales of subscriptions into the United States on the Plex streaming service. As such, both Defendants acted jointly and in concert to commit the violations alleged herein.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (*i.e.*, the VPPA). Moreover, this Court has

jurisdiction under the Class Action Fairness Act ("CAFA") because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than 100 members of the classes, and there is minimal diversity. 28 U.S.C. § 1332(d)(2). Additionally, this Court has supplemental jurisdiction over the California state law claim because the pursuant to 28 U.S.C. § 1367 because the state law claims alleged herein form part of the same case or controversy.

10. This Court has personal jurisdiction over Defendants because they conduct substantial business within the State of California and this District, including the sale, marketing and advertising of Plex subscriptions. Furthermore, a substantial portion of the events giving rise to Plaintiff's claims occurred in this District. Further, Defendant Plex, Inc. resides in this District.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District. In particular, Plaintiff requested and viewed videos from Defendants' website and Defendants disclosed Plaintiff's video viewing information to an unauthorized third party, Meta, while residing in this District.

## FACTUAL ALLEGATIONS

### I. Background of the VPPA.

12. The origins of the VPPA begin with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper, which then published that history.

13. With an eye toward the digital future, Congress responded by passing the VPPA. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

14. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4).

15. As Senator Patrick Leahy explained, the VPPA was particularly concerned with consumers' video transactional data being shared with unauthorized third parties:

> The trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance. These 'information pools' create privacy interests that directly affect the ability of people to express their opinions, to join in association with others and to enjoy the freedom and independence that the Constitution was established to safeguard. The bill prohibits video stores from disclosing "personally identifiable information"—information that links the customer or patron to particular materials or services. In the event of an unauthorized disclosure, an individual may bring a civil action for damages.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

16. The Senate Report for the bill further clarifies "that personally identifiable information is intended to be transaction oriented. It is information that identifies a particular person as having engaged in a specific transaction with a video tape service provider." S. Rep. 100-599, at 12.

**II. California Civil Code § 1799.3.**

17. Cal. Civ. Code § 1799.3 provides a wider breadth of protection for consumers by requiring that:

> No person providing video recording sales or rental services shall disclose any personal information or the contents of any record, including sales or rental information, which is prepared or maintained

> by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual.

18. Cal. Civ. Code § 1799.3 does not require that the information being disclosed by video recording sales or rental service providers be ***identifiable*** to any one particular person. Rather, the statute forbids the disclosure of generalized "personal information" without that person's consent even if that information does not serve to identify them.

19. The statute also forbids the mere disclosure of "the contents of any record, including sales or rental information," such as the mere title of the movie ticket purchased or a video requested.

**III. The Meta Tracking Pixel.**

20. Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[2] Facebook describes itself as a "real identity platform,"[3] meaning users are allowed only one account and are encouraged to share "the name they go by in everyday life."[4] To that end, when creating an account, users provide their first and last name, along with their birthday, gender and phone number or email address.[5]

21. Meta owns facebook.com and generates revenue by selling advertising space on its website, and other applications it owns, like Instagram.[6]

---

[2] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html. (last accessed Feb. 28, 2024).

[3] Sam Schechner & Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021) (last accessed Feb. 28, 2024).

[4] FACEBOOK, *Community Standards, Part IV Integrity and Authenticity*, https://www.facebook.com/communitystandards/integrity_authenticity (last accessed Feb. 28, 2024).

[5] FACEBOOK, *Sign Up*, https://www.facebook.com/ (last accessed Feb. 24, 2024).

[6] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html (last accessed Feb. 28, 2024).

22. Meta sells advertising space by highlighting its ability to target users.[7] Meta can target users effectively because it surveils user activity both on and ***off its site***.[8] This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[9] Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[10]

23. Businesses can also build "Custom Audiences."[11] Custom Audiences enable businesses to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[12] Businesses can use Custom Audiences to target existing customers directly, or they can use it to build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[13] Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Meta. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing

---

[7] FACEBOOK, *Why Advertise on Facebook*, https://www.facebook.com/business/help/205029060038706 (last accessed Feb. 28, 2024).

[8] FACEBOOK, *About Facebook Pixel*, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last accessed Feb. 28, 2024).

[9] FACEBOOK, *Ad Targeting: Help your ads find the people who will love your business*, https://www.facebook.com/business/ads/ad-targeting (last accessed Feb. 28, 2024).

[10] FACEBOOK, *Easier, More Effective Ways to Reach the Right People on Facebook*, https://www.facebook.com/business/news/Core-Audiences (last accessed Feb. 28, 2024).

[11] FACEBOOK, *About Custom Audiences*, https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last accessed Feb. 28, 2024).

[12] FACEBOOK, *About Events Custom Audience*, https://www.facebook.com/business/help/366151833804507?id=300360584271273 (last accessed Feb. 28, 2024).

[13] FACEBOOK, *About Lookalike Audiences*, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last accessed Feb. 28, 2024).

Facebook's "Business Tools," which collect and transmit the data automatically.[14] One such Business Tool is the Meta Tracking Pixel.

24. The Meta Tracking Pixel is a piece of code that businesses, like Defendants, can integrate into their website. Once activated, the Meta Tracking Pixel "tracks the people and type of actions they take."[15] When the Meta Tracking Pixel captures an action, it sends a record to Facebook. Once this record is received, Meta processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

25. Businesses control what actions—or, as Meta calls it, "events"—the Meta Tracking Pixel will collect on that business's site, including the website's metadata, along with what pages a consumer views.[16] Businesses can also configure the Meta Tracking Pixel to track other events. Meta offers a menu of "standard events" from which businesses can choose to track, including what content a consumer views or purchases.[17] An advertiser can also create their own tracking parameters by building a "custom event."[18]

26. Likewise, businesses using the pixel on their website control how the Meta Tracking Pixel identifies consumers. The Meta Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[19] HTTP Headers collect "IP addresses, information about the

[14] FACEBOOK, *Create a Customer List Custom Audience*, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; *See also* FACEBOOK, *Create a Website Custom Audience*, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last accessed Feb. 24, 2024).

[15] FACEBOOK, *Retargeting*, https://www.facebook.com/business/goals/retargeting (last accessed Feb. 24, 2024).

[16] *See* FACEBOOK, *Facebook Pixel, Accurate Event Tracking, Advanced*, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, *Best Practices for Facebook Pixel Setup*, https://www.facebook.com/business/help/218844828315224?id=1205376682832142 (last accessed Feb. 28, 2024).

[17] FACEBOOK, *Specifications for Facebook Pixel Standard Events*, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last accessed Feb. 28, 2024).

[18] FACEBOOK, *About Standard and Custom Website Events*, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (last accessed Feb. 28, 2024).

[19] FACEBOOK, *Facebook Pixel*, https://developers.facebook.com/docs/facebook-pixel/ (last accessed Feb. 28, 2024).

web browser, page location, document, referrer and persons using the website."[20] Pixel-specific Data includes "the Pixel ID and cookie."[21]

27. The Meta Pixel, like website cookies generally, attaches to the browser that the user uses to access their Facebook account. That cookie then follows the user's web activity occurring within that same browser. For example, if the user accesses Facebook.com through their Safari browser, then moves to Macys.com after leaving Facebook, the Meta pixel will continue to track that user's activity on that browser.

**IV. Plex & the Meta Pixel.**

28. Plex allows subscribers to stream a variety of video content, including television programs and full-length films. It offers free subscriptions, which are accessed by signing up with an email address or directly through a Google, Apple, or Facebook account.[22]

29. To sign up, consumers either enter their email and choose a password or click one of three buttons which read "Continue with Google," Continue With Apple," and "Continue With Facebook," respectively. Those three buttons prompt a sign in with the user's account on the linked platform, which then signs the user in to Plex and takes them directly into their new account.

30. From the moment consumers enter Defendants' website, the Meta Tracking Pixel follows them and records their activity.

31. The Meta Tracking Pixel watches exactly what consumers request to watch once they enter Plex's library of movies. The title of every film and show on Plex is reflected in the URL of the page. As such, when the PageView discloses the URL of the webpage, it also discloses the video title. Defendants configured the Meta Tracking Pixel on its website to (or chose to not alter the Pixel's settings to stop) create a PageView event every time a consumer goes to the webpage playing the video. This causes the URL and corresponding webpage activity to be captured by Meta's tracking pixel which then transmits the captured activity.

---

[20] *Id.*

[21] *Id.*

[22] Plex, https://www.plex.tv/ ("Sign up" button in the top righthand corner) (Last accessed March 1, 2024).

32. For example, if a consumer views the film "Reservoir Dogs" and loads the page including the video player, Plex discloses to Meta the URL of the page during an "event."




***Figure 1***

33. In the background, the Meta pixel records the title of the film and Plaintiff and the Classes' personally identifying information in two ways: by using the c_user tracking pixel and email hashing.

*A. <u>Facebook's C_User and Hashing Cookie Tracking</u>.*

34. When a consumer watches a video on Plex on the same browser they access their Facebook account, Defendants compel the consumer's browser to transmit an identifying "computer cookie" to Meta called the Meta Tracking Pixel. Within that Pixel is the "c_user." The c_user cookie contains that consumer's unique, page-specific, unencrypted Facebook ID. When accessing the movie shown in Figure 1, for example, the Meta Pixel on the Plex website captures the user's activity. As illustrated in figure 2 below, the c_user cookie collects the movie title and the user's unique and personal Facebook page-specific ID.




***Figure 2***[23]

35. That same c_user cookie aggregates and discloses PII because it contains a consumer's unique, page-specific Facebook ID. A Facebook ID allows *anybody*—not just Facebook—to identify the individual consumer. Specifically, if one types

[23] Figure 2 demonstrates the pixel's capturing the user's initial request of the video and the capture of the c_user cookie and fr cookie.

www.facebook.com/[FacebookID] into a web browser, it will load that individual's Facebook page.

36. The c_user cookie discloses to Meta both the name of the video that the consumer has requested and watched as well as the user's unique, identifying Facebook ID.

37. In addition, The Meta Tracking Pixel transmits other cookies to Meta.

38. Specifically, the "fr" cookie contains, at least, an encrypted Facebook ID and browser identifier.[24] Facebook, at a minimum, uses the fr cookie to identify particular users.[25]

39. Even without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser. Facebook uses this for, among other uses, targeted advertising.

40. The Meta Tracking Pixel uses both first and third-party cookies. A first-party cookie is "created by the website the user is visiting"—*i.e.*, Plex.[26] A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[27]

41. Meta, at a minimum, uses the fr and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

42. A Facebook ID is personally identifying. Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of https://facebook.com/. By way of an additional example, searching facebook.com/4 will reveal the Facebook page of Meta's founder, Mark Zuckerberg.

---

[24] DATA PROTECTION COMMISSIONER, *Facebook Ireland Ltd, Report of Re-Audit* (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf. (last accessed Feb. 28, 2024).

[25] FACEBOOK, *Cookies & other storage technologies*, https://www.facebook.com/policy/cookies/ (last accessed Feb. 28, 2024).

[26] PC MAG, *first-party cookies*, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[27] PC MAG, *Third-party cookies*, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

43. Through the Meta Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Meta to know, among other things, that a given consumer subscribed to Plex, requested a video, and the name of that video.

44. What is more, when a subscriber logs into Plex in the browser they accessed their Facebook account, Meta is sent the email address used to log in to the site. The email address is encrypted by way of a process known as SHA256, which is a way to "hash" written words in a series of random numbers.

45. The Meta Pixel is designed to collect information about website visitors that can be matched to an individual's Facebook profile for the purpose of sending targeted advertising to that user. Though the "hashing" would prevent a party that is not Meta from obtaining the subscriber's email address, Meta, as the recipient of the data and the entity that creates the hash, can decrypt the hashed email addresses it receives and match it to the profile of the users.

46. For example, the following is the information sent to Meta when a user logs into Plex. The tester in figure 4 used the email thommy5431@yahoo.com. When that address is encrypted on a SHA256 encryption website, the value: 2a9a22d88b031064ea86ff104d1cabf6b14a866c2a4adf136def1330b49fecbb is produced.[28] That same value appears in the information sent to Meta. As shown in figure 4, which is a transmission event from Plex to Facebook via the Meta Tracking Pixel.

[28] https://10015.io/tools/sha256-encrypt-decrypt (last accessed February 22, 2024).

cd[pageFeatures] %7B%22title%22%3A%22Watch%20Good%20Time%20(2017)%20Full%20Movie%20Free%20Online%20-%20Plex%22%7D
cd[parameters] %5B%5D
sw 1920
sh 1080
udff[em] 2a9a22d88b031064ea86ff104d1cabf6b14a866c2a4adf136def1330b49fecbb
v 2.9.147
r stable
ec 3
o 6174
fbp fb.1.1709143264271.277913871
cs_est true
ler other
cdl API_unavailable
it 1709143318218
coo false
es automatic
tm 3
exp e1
rqm GET


***Figure 3***

47. As demonstrated by Figure 4, the transmission shows the Facebook user's email is converted into a unique SHA256 value. Meta matches the email addresses it receives to the email addresses of Facebook users, which is used to create and access a Facebook account.

48. Plex begins to collect this information through the Meta Pixel when a user first signs up for an account.

49. Defendants disclose these identifiers so Meta can match them with a corresponding Facebook profile and link it to a subscriber's subsequent activity on Plex and across the internet.

**V. Defendants Fail to Provide Adequate Notice and Obtain Proper Consent.**

50. While Plex has been disclosing consumers' PII and video viewing information to Meta, it has not properly obtained consumer consent as required by the VPPA and Cal. Civ. Code § 1799.3.

51. The VPPA only allows a video tape service provider to disclose PII of a consumer to a third party "with the informed, written consent (including through an electronic means using

the Internet) of the consumer that—(i) is in a form distinct and separate from any form setting forth other legal or financial obligations to the consumer." 18 U.S.C. § 2710(B)(i). The video tape service provider must also "provide[] an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." 18 U.S.C. § 2710(B)(iii).

52. Likewise, under Cal. Civ. Code § 1799.3, a person providing video recording sales or rental services must obtain written consent of the individual whose personal information or records of sales or rental information is being disclosed.

53. Plex failed to meet the consent requirements under both VPPA and Cal. Civ. Code § 1799.3 because it did not obtain informed, written consent, in a separate and distinct form (as required by VPPA), or simply written consent (as required by Cal. Civ. Code § 1799.3) from Plaintiff and the Class.

54. On the Plex sign-up screen, demonstrated below, a consumer creating a Plex account with Google, Facebook, or Apple can do so without scrolling to the bottom-screen notices of any of Defendants' terms of service. As such, the consumer would not be appraised of, nor given the opportunity to consent to, the Defendants' disclosure of consumers' PII to a third party like Meta when they sign up through Google, Apple, or Facebook.






***Figure 4***[29]

55. Specifically, the text at the bottom of the screen informing the user that creating an account constitutes assent to the Terms of Service and Privacy Policy is not close enough to the "Continue With…" buttons for the user to understand, or even see, that they are bound by any terms. Importantly, the language accompanying account creation through the third-party companies does not clearly indicate that signing in via the "Continue With..." buttons, rather than creating an account with an email address and creating a password, binds a user to the Terms of Service and Privacy Policy. Moreover, as shown in Figure 4 above, when a consumer is presented with the sign-up screen, any terms of service or privacy policy Defendants present are not immediately visible and require the consumer to scroll down the page. As such, if a user were to create an account using either the Google, Facebook, or Apple buttons, they would not need to scroll down the page at all, and would, therefore, never be appraised of any terms supposedly

[29] Figure 4 is a true and correct image of Defendants' website as it appeared on Plaintiff's Counsels' browser on March 2, 2024. The top image is what appears on the browser when a user clicks the "Sign Up" button. The bottom image is the remaining page content, which is revealed when the user scrolls down the page. A user is able to click the top three "Continue with…" buttons without scrolling down the page.

relevant to their account creation buried *below* the unnecessary “Create Account” button for a standard email and password creation sign-up.

56. In fact, when a user signs up through their Google account, as of March 3, 2024, they are shown:




***Figure 5***

57. Although Plex includes a link to the terms of service below, the user is simply *offered* the option to view them; their use of Defendants’ website is not contingent on their *agreeing* to those terms. *See* Figure 5 (“Before using this app, you can *review* Plex’s privacy policy and terms of service.”) (underlining and emphasis added). In addition, because the notice under the Gmail sign up affirmatively explains what *Google* will share, there is nothing to suggest a reasonable consumer is on notice or, or would presume that, any arbitration, class action waiver, or disclosure permissions are hidden in Plex’s *offered* terms of service.

58. Likewise, a user signing up through both Facebook and Apple, as of March 3, 2024, is not even presented with the option to review Defendants’ terms:




***Figure 6***




***Figure 7***

59. Similarly, when users log into their existing accounts to view videos, they do not agree to any policy regarding the sharing of their PII or video viewing information.




***Figure 8***

60. Likewise Defendants' April 2020 sign-up form requires that a consumer scroll to the bottom to be fully appraised of any terms or conditions. But, a consumer creating an account through Google, Facebook, or Apple would not need to scroll at all to create their account and thus, would not need to review anything under the "Or" line.






***Figure 9***

61. Critically, both the current sign-up and 2020 sign-up pages do not put a consumer on notice of their terms and contents. The Terms and Privacy Policy are not presented as clear hyperlinks. In fact, the April 2020 "Terms of Service" and "Privacy Policy" colors and font match the static "Email address" and "Create password" guideposts above the "Create an Account" button, which are not clickable. As such, a reasonable consumer would not be on notice that the terms and privacy policy even link to an external webpage containing any obligations.

62. Likewise, Plex also failed to fulfill VPPA's requirement of providing consumers with "an opportunity in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." 18 U.S.C. § 2710(B)(iii). At no point did Defendants give consumers the opportunity to withdraw from ongoing disclosures of their PII in a clear and conspicuous manner during the Class periods.

## <u>REPRESENTATIVE PLAINTIFF'S EXPERIENCES</u>

63. Prior to creating an account with Plex, Plaintiff created a Facebook account.

64. In or around April 2020, Plaintiff created a Plex account using the "Continue with Facebook" button. As such, and as demonstrated by the images above, Plaintiff was not put on notice of the terms, was not asked to assent to those terms during the enrollment period, and therefore, did not assent to them. Once Plaintiff created an account, Defendants disclosed his PII to Meta by installing the Meta Tracking Pixel in the background of its movie streaming platform.

65. Since creating a Plex account, Plaintiff frequented the site to watch videos, including as recently as April 2024.

66. When Plaintiff watched videos on Plex, Defendants disclosed his event data, which recorded and disclosed the video's title to Meta. Defendants also disclosed identifiers for Plaintiff, including the c_user and fr cookies and hashed email to Meta.

67. By disclosing his event data and identifiers, Defendants disclosed Plaintiff's PII to Meta.

68. Plaintiff intends to use Plex again in the future, but he fears that by doing so, Defendants will again transmit his PII to Meta without his consent.

## CLASS ALLEGATIONS

69. **Nationwide Class Definition**: Plaintiff seeks to represent a class of similarly situated individuals defined as (collectively, the "Classes"):

> All persons in the United States who have a Facebook account and created a Plex account, or signed in to Plex, with a Google, Facebook, or Apple account and viewed videos on watch.plex.tv using the same browser they use to access their Facebook account until March 2, 2024 (the "Nationwide Class").

70. **California Class Definition**: Plaintiff seeks to represent a class of similarly situated individuals defined as:

> All persons in the State of California who have a Facebook account and created a Plex account, or signed in to Plex, with a Google, Facebook, or Apple account and viewed videos on watch.plex.tv using the same browser they use to access their Facebook account until March 2, 2024 (the "California Class").

71. Subject to additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

72. Excluded from the Classes are Defendants, their past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns and any entity in which any of them have a controlling interest, as well as all judicial officers assigned to this case, their immediate families, Plaintiff's counsel and Defendants' counsel.

73. **Numerosity (Fed. R. Civ. P. 23(a)(1))**: At this time, Plaintiff does not know the exact number of members of the aforementioned Classes. However, given the popularity of Defendants' website, the number of persons within both Classes is believed to be so numerous that joinder of all members is impractical.

74. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3))**: There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include:

(a) whether Defendants collected Plaintiff and the Classes' PII;

(b) whether Defendants unlawfully disclosed and continues to disclose its users' PII in violation of the VPPA;

(c) whether Defendants' disclosures were committed knowingly and intentionally;

(d) whether Defendants disclosed Plaintiff's and the Classes' PII without consent; and

(e) whether Defendants' conduct violates California Civil Code § 1799.3.

75. **Typicality (Fed. R. Civ. P. 23(a)(3))**: Plaintiff's claims are typical of those of the Classes because Plaintiffs, like all members of the Classes, used Plex to watch videos, and had their PII collected and disclosed by Defendants without their consent. Moreover, Plaintiff, like all members of the California Class, used Plex to watch videos, and had his personal information shared with Meta in violation of Cal. Civ. Code § 1799.3.

76. **Adequacy (Fed. R. Civ. P. 23(a)(4))**: Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation. Plaintiff and his counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Classes. Neither Plaintiff nor his counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Classes. Plaintiff has raised viable statutory claims of the type reasonably expected to be raised by members of the Classes and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Classes (or to address additional Classes),

additional claims as may be appropriate, or to amend the definition of the Classes to address any steps that Defendants took.

77. **Superiority (Fed. R. Civ. P. 23(b)(3))**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable. Even if every member of the Classes could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Classes. Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

## COUNT I

**Violation of the Video Privacy Protection Act**
**18 U.S.C. § 2710, *et seq.***
**(By Plaintiff on behalf of the Nationwide Class)**

78. Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

79. Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class against Defendants.

80. Defendants are a "video tape service provider" because they create, host, and deliver videos on its website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). In particular, Defendants provide a library of audiovisual material to users with accounts.

81. Plaintiff and members of the Nationwide Class are "consumers" because they created Plex accounts to watch videos on Plex with those accounts. 18 U.S.C. § 2710(a)(1).

82. Defendants disclosed to a third party, namely Meta/Facebook, Plaintiff's and the Nationwide Class Members' PII. Defendants utilized the Meta Tracking Pixel to compel Plaintiff's and Class members' web browser to transfer his identifying information, like the Facebook ID and hashed email address, along with Plaintiff's and Class members' event data, like the title of the videos viewed.

83. Plaintiff and the Nationwide Class viewed videos using Plex's streaming website.

84. Defendants knowingly disclosed Plaintiff's PII because they knowingly and intentionally installed the Facebook Tracking Pixel on their website and controlled its functionally on that site.

85. Plaintiff and Nationwide Class did not provide Defendants with any form of consent—either written or otherwise—to disclose their PII to third parties.

86. Nor were Defendants' disclosures made in the "ordinary course of business," as the term is defined by the VPPA. In particular, Defendants' disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

87. On behalf of himself and the members of the Nationwide Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Nationwide Class by requiring Defendants to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## COUNT II
## Violation of California Civil Code § 1799.3
## On Behalf of the California Class

88. Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

89. Plaintiff brings this claim individually and on behalf of the members of the proposed California Class against Defendants.

90. Cal. Civ. Code § 1799.3(a) prohibits a "person providing video recording sales and rental services" from disclosing "any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual."

91. Defendants are "person[s] providing video recording sales and rental services" because it offers consumers access to prerecorded video content which Plex consumers can access.

92. Defendants disclosed to Meta Plaintiff's and the California Class members' personal information and/or the records of Plaintiff and California Class members' video viewing information. Defendants utilized the Meta Tracking Pixel to compel Plaintiff's web browser to transfer Plaintiff's personal information and video request records. For example, the tracking pixels disclosed his Facebook ID and his event data, like the title of the shows and movies he requested.

93. Plaintiff and the California Class members requested, obtained, and viewed video content provided via watch.plex.tv.

94. Defendants willfully disclosed Plaintiff's personal information because it knowingly and intentionally installed the Facebook Tracking Pixel on its website and controlled its functionality on its site.

95. Plaintiff and California Class members did not provide Defendants with any form of consent—either written or otherwise—to disclose their personal information to third parties.

96. On behalf of himself and the California Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the California Class by requiring Defendants to comply with Cal. Civ. Code §1799.3's requirements for protecting a consumer's personal information; (iii) statutory damages of $500 for each violation of the Cal. Civ. Code §1799.3 pursuant to Cal. Civ. Code §1799.3(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff seeks a judgment against Defendants, individually and on behalf of all others similarly situated, as follows:

(a) For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative of the Nationwide Class and the representative of the California Class, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

(b) For an order declaring that Defendants' conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d) An award of statutory damages to the extent available;

(e) For punitive damages, as warranted, in an amount to be determined at trial;

(f) For prejudgment interest on all amounts awarded;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: August 5, 2024

**BURSOR & FISHER, P.A.**

By: */s/ Neal J. Deckant*
Neal J. Deckant

Neal J. Deckant (State Bar No. 322946)
Joshua R. Wilner (State Bar No. 353949)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ndeckant@bursor.com
jwilner@bursor.com
jglatt@bursor.com

*Attorneys for Plaintiff*