UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD LEE, | Case No. 24-cv-02386-EKL |
| Plaintiff, | |
| v. | **ORDER GRANTING MOTION TO DISMISS IN PART** |
| PLEX, INC., et al., | Re: Dkt. No. 22 |
| Defendants. | |

This action arises from Plaintiff's use of Defendants' online video streaming service, Plex. First Am. Compl. ¶ 1, ECF No. 21 ("Compl."). Plaintiff alleges that Defendants surreptitiously tracked his viewing activities and shared them with Meta without his consent. *Id*. ¶ 2. Defendants filed an omnibus motion to compel arbitration, to dismiss the complaint for lack of personal jurisdiction and for failure to state a claim, to strike class allegations, and to transfer the case to Delaware. Mot. to Dismiss, ECF No. 22 ("Mot."). For the following reasons, the Court GRANTS the motion to dismiss for lack of personal jurisdiction, but otherwise DENIES the motion.

## I.    BACKGROUND[1]

Defendants are Plex GmbH and Plex, Inc. Plex GmbH is "a Swiss corporation with its principal place of business" in Berlin, Germany. *Id*. ¶ 8. Plex, Inc. is "a Delaware corporation with its principal place of business" in Los Gatos, California. *Id*. ¶ 7. The complaint refers to Plex GmbH and Plex, Inc. collectively as "Defendants" or "Plex," without attributing conduct to one Plex entity or the other. Compl. at 1; *see also infra* Section III.B. Accordingly, the Court will refer to Defendants collectively as "Plex," except when necessary to distinguish them.

---

[1] Unless otherwise noted, the facts are taken from the complaint and assumed to be true for purposes of this motion.

United States District Court
Northern District of California

Plex offers "TV, video, and movie streaming" through its streaming service, which is also called "Plex." Compl. ¶ 1. Plaintiff "subscribed to Plex's streaming service in 2020 and continued to watch videos on the service until as recently as April 2024." *Id.* ¶ 6. Plaintiff claims that Plex uses the Meta Tracking Pixel to "secretly and surreptitiously send[] consumers' viewing activities to third-party providers like . . . [Meta] without consent." *Id.* ¶ 2. "The Meta Tracking Pixel is a piece of code that businesses, like [Plex], can integrate into their website." *Id.* ¶ 24. The Meta Tracking Pixel works by "attach[ing] to the browser that the user uses to access their Facebook account" and then "follows the user's web activity occurring within that same browser." *Id.* ¶ 27.

Relevant here, "[w]hen a consumer watches a video on Plex on the same browser they access their Facebook account," Plex allows the Meta Tracking Pixel to share the user's viewing activity with Meta. *Id.* ¶ 34. Plaintiff alleges that he visits the Plex website to "watch videos using the same web browser he uses to access his facebook.com account," *id.* ¶ 6, thus Plex has shared his viewing activity with Meta. Plex allegedly sends Meta "the name of the video" that the user watched or requested along with "the user's unique, identifying Facebook ID" and email address. *Id.* ¶¶ 36, 43-44, 66, 82. Meta allegedly uses "video consumption habits to build profiles on consumers and deliver targeted advertisements to them[.]" *Id.* ¶ 5.

Plaintiff claims that Plex's conduct violates the Video Privacy Protection Act ("VPPA"), 18 U.S.C. §§ 2710 *et seq.*, and California Civil Code § 1799.3. *See* Compl. ¶¶ 78-96. Plex filed a multi-part motion seeking several forms of relief. Many of Plex's arguments turn on the threshold question of whether Plaintiff agreed to Plex's terms of use and privacy policy by creating an account on the Plex website. The Court addresses this question in resolving Plex's motion to compel arbitration, then addresses Plex's other motions in turn.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

United States District Court
Northern District of California

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.     MOTION TO COMPEL ARBITRATION

### A.     Legal Standard

In deciding whether to compel arbitration, a court must determine: "(1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).  State contract law governs the contract formation question.  *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022).  The parties agree that California law applies.  *See* Mot. at 7; Opp. at 3.  The burden is on Plex to demonstrate that there was mutual assent to the agreement to arbitrate.  *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1099 (9th Cir. 2023).

### B.     Discussion

Here, the existence of an agreement to arbitrate depends on whether Plaintiff agreed to Plex's terms of service by signing up for a Plex account on Plex's website in April 2020. *See* Compl. ¶¶ 6, 64.  "In California, internet contracts are classified 'by the way in which the user purportedly gives their assent to be bound by the associated terms:  browsewraps, clickwraps, scrollwraps, and sign-in wraps.'"  *Keebaugh v. Warner Bros. Ent. Co.*, 100 F.4th 1005, 1014 (9th Cir. 2024) (quoting *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 463 (2021)).  This case involves a sign-in wrap agreement:  "[T]he website provides a link to terms of use and indicates that some action may bind the user but does not require that the user actually review those terms." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025).[2]  Absent proof that a consumer has actual knowledge of the agreement,[3] a sign-in wrap agreement will be enforced only if "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms."  *Berman*, 30 F.4th at 856.

---

[2] The Ninth Circuit issued its *Chabolla* opinion after briefing closed and after the Court heard argument on Plex's motion.  The Court invited Plaintiff and Plex to file supplemental briefs addressing the significance of *Chabolla* to Plex's motion.  *See* ECF No. 44.  The Court reviewed and considered the parties' supplemental briefs.  *See* ECF Nos. 45, 46.

[3] Plaintiff alleges that he lacked actual knowledge of Plex's terms of service, which include the arbitration agreement.  *See* Compl. ¶ 64.  Plex offers no evidence to the contrary.

3

United States District Court
Northern District of California

1    The Court begins by describing the sign-in wrap agreement on Plex's website, and then

2    turns to the issues of notice and assent.

3    **1.    Plex's sign-in wrap agreement**

4    A Plex user encounters two pages when creating a Plex account:  a sign-up page ("Sign-Up

5    Page"), followed by a "Userflow" page that depends on whether the user creates an account

6    directly with Plex or through a third-party application.  These pages are depicted in Figures 1 and

7    2, included in the Appendix to this Order.

8    The Sign-Up Page has a white background with prominent black text at the top that

9    instructs the user to "Create your free account."  Directly beneath this text, the user encounters

10    three interactive buttons, and each button allows the user to create an account through a third-party

11    application.  The first button is white and allows the user to "Continue with Google"; the second is

12    blue and allows the user to "Continue with Facebook"; the third is black and allows the user to

13    "Continue with Apple."  Each button also bears the third-party application's logo.  *See* Fig. 1.  If a

14    user creates an account by clicking one of these buttons, the user is "automatically presented" with

15    the next page of the account creation process.  *See* Castro Decl. ¶ 11, ECF No. 22-2.  The user

16    does not need to read or interact with any other part of the Sign-Up Page.  If the user chooses not

17    to use one of the third-party applications, the user can create an account by entering an email

18    address in one field and creating a password in another field.  Directly beneath the email and

19    password fields, there is an orange button labeled "Create an Account."  The "Create an Account"

20    button cannot be clicked until the user enters an email address and a password.  Finally, beneath

21    the "Create an Account" button, the Sign-Up Page states in gray text:  "Already have an account?

22    **Sign in**."  *See* Fig. 1.

23    Below all this text, the very bottom of the Sign-Up Page states:  "By creating an account or

24    continuing to use a Plex application, website, or software, you acknowledge and agree that you

25    have accepted the **Terms of Service** and have reviewed the **Privacy Policy**."  The phrases "Terms

26    of Service" and "Privacy Policy" appear in gray font like the rest of the sentence, but they are

27    bolded.  The "Terms of Service" text hyperlinks to Plex's terms of service, and the "Privacy

28    Policy" text hyperlinks to Plex's privacy policy.  Other than the use of bold font, Plex does not

4

1  emphasize the hyperlinks with typical website design conventions, such as the use of underlined

2  text or a contrasting color font (*e.g.*, blue).[4]  *See* Fig. 1.

3       In this case, Plaintiff clicked on the prominent blue "Continue with Facebook" button near

4  the top of the Sign-Up Page.  Compl. ¶ 64.  That button directed Plaintiff to a second page, the

5  "Facebook Userflow."  This page has a white background and displays the Facebook and Plex

6  logos at the top.  *See* Fig. 2.  Black text informs the user that "**Plex is requesting access to**:  Your

7  name and profile picture and email address."  Beneath this notice, the user can click on similarly-

8  sized blue text that states:  "Edit access."  Near the bottom of the page is a blue button labeled

9  "Continue as [user's name]."  Beneath the blue button is a gray button of the same size labeled

10 "Cancel."  Beneath these buttons, the smallest text on the page states:  "By continuing, Plex will

11 receive ongoing access to the information you share and Facebook will record when Plex accesses

12 it.  **Learn more** about this sharing and the settings you have."  The "Learn more" text is blue; the

13 rest of the text is gray.  Beneath this language, the text at the very bottom of the Facebook

14 Userflow states:  "Plex's Privacy Policy and Terms of Service."  The text for "Privacy Policy" and

15 "Terms of Service" is blue – but not underlined or bolded – and it hyperlinks to Plex's privacy

16 policy and terms of service, respectively.  *See* Fig. 2.

17            **2.      Reasonably conspicuous notice**

18       Courts consider several factors to determine whether a website provides reasonably

19 conspicuous notice of a sign-in wrap agreement.  *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505,

20 514-15 (9th Cir. 2023) (observing that the reasonable notice inquiry is context- and fact-specific).

21 First, courts consider the "context of the transaction," including the "nature of the service or goods

22

─────────────────

23 [4] Plaintiff argues that a user visiting the Sign-Up Page would not see the links to the "Terms of
   Service" and "Privacy Policy" on the same page as the "Continue with Facebook" button when
24 using normal browser settings.  Opp. at 1, 3-5, ECF No. 29.  The complaint contains a screenshot
   taken by Plaintiff's counsel, Mr. Glatt, in 2024 to illustrate that a user must scroll down the Sign-
25 Up Page to encounter the notice language.  *See* Compl. Fig. 4; Glatt Decl. ¶¶ 5-9, ECF No. 29-1.
   But Plaintiff does not allege how he accessed the Sign-Up Page when he created a Plex account in
26 2020, or that the browser settings used by Mr. Glatt are representative of the settings that Plaintiff
   used.  Plex has submitted its own version of the Sign-Up Page that displays on one page – without
27 requiring the user to scroll down to find the notice language.  Castro Decl. ¶¶ 14-15 & Ex. C.  Plex
   attests that its version reflects how a user would have encountered the Sign-Up Page in 2020.  *Id.*
28 For purposes of this motion, the Court assumes that Plex's version of the Sign-Up Page is accurate
   and representative of the page that Plaintiff encountered in 2020.

offered." *Chabolla*, 129 F.4th at 1155.  Where a transaction involves a "continuing relationship" with the website operator, the user should expect to be "bound by terms, even if not explicitly told." *Id*.  Second, courts consider visual aspects of the website.  *Id*.  The "overall design" of the website is important:  a cluttered design may contain "visual elements [that] draw the user's attention away" from important terms.  *Berman*, 30 F.4th at 857.  The placement of the notice on the webpage is also relevant.  Placing a notice "directly above or below the relevant action item in a manner disrupting the natural flow of actions" is more likely to draw the user's attention to the fact that terms apply.  *See Chabolla*, 129 F.4th at 1157.  Additionally, the notice "must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it."  *Berman*, 30 F.4th at 856.  When small or hard-to-read font is used, the "comparatively larger font used" for other elements of the webpage may "direct[] the user's attention everywhere else."  *Id*. at 857.  Finally, if a hyperlink is used to disclose terms and conditions, "the fact that a hyperlink is present must be readily apparent."  *Id*.  "A web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently 'set apart' from the surrounding text."  *Id*.

The Court begins with the context of the transaction between Plaintiff and Plex.  Plaintiff alleges that Plex "offers free subscriptions" that allow users "to stream a variety of video content, including television programs and full-length films."  Compl. ¶ 28.  Plaintiff created an account to use Plex's streaming service, *id*. ¶ 6, but he did not enter into a paid membership plan that involved ongoing transactions – or even a single paid transaction.  Thus, although Plaintiff and Plex had a "continuing relationship" in that Plaintiff was free to continue using Plex's service, Plaintiff had no "reason to look for additional terms and conditions not explicitly listed on [Plex's] website."  *Chabolla*, 129 F.4th at 1156.

Comparing the facts in this case to those in recent Ninth Circuit decisions is instructive.  In *Chabolla*, the plaintiff purchased a "plan" or "membership" to "gain access to gyms."  *Id*.  The Ninth Circuit found that this relationship did not weigh in favor or against the notice requirement because users were advised that they were "never locked in," that there were "no commitments," and that they could "cancel anytime."  *Id*. at 1155.  Similarly, here, Plaintiff's

6

relationship with Plex imposed no commitments on Plaintiff – he was free to use or stop using Plex's service at any time.  By contrast, in *Keebaugh*, the Ninth Circuit found that users who downloaded a mobile game to their phones that involved "potentially unlimited in-app purchases" would understand that use of the app "would be governed by some terms of use."  100 F.4th at 1020.  Here, Plaintiff's free subscription to Plex's streaming service did not portend any future purchases – let alone "potentially unlimited" purchases.  Finally, in *Oberstein*, the Ninth Circuit found that, in the context of a ticket purchasing website, the use of a "full registration process . . . would have put users on notice" of a continuing relationship and to look for "a link to the terms of that continuing relationship."  60 F.4th at 517.  Here, Plaintiff was able to sign up for Plex's service by clicking just one button and continuing through his Facebook account; he was not required to provide payment information, and the relationship did not contemplate any future purchases that would be bound by terms.  Accordingly, the Court finds that the context of Plaintiff's relationship with Plex did not put him on notice to look for additional terms.

Next, the Court considers visual aspects of the website, beginning with the Sign-Up Page. The Court finds that the notice on the Sign-Up Page is not reasonably conspicuous for at least three reasons.  First, the notice was placed at the very bottom of the visible page, far below the "Continue with Facebook" button that Plaintiff clicked to create his account.  Plaintiff had no reason to read to the bottom of the Sign-Up Page because clicking on the prominent "Continue with Facebook" button "automatically" directed him to the Facebook Userflow, where he completed the account creation process.  Clark Decl. ¶ 11; *see Chabolla*, 129 F.4th at 1157 ("A reasonably prudent user would likely click 'Continue' and read no further[.]").  Second, the notice is presented in small gray font at the bottom of the Sign-Up Page.  Although it is legible, it is far less prominent than the colorful buttons that the user must click to create an account.  Finally, the "Terms of Use" and "Privacy Policy" "appeared in the same gray font as the rest of the sentence, rather than in blue, the color typically used to signify the presence of a hyperlink."  *Berman*, 30 F.4th at 854.  The text is bolded, but it is not underlined or presented in a "contrasting font color" to indicate that it hyperlinks to additional terms.  *Id.* at 857.  To the contrary, the same bolded gray font is also used for other elements of the Sign-Up Page that do not appear to be hyperlinks –

United States District Court
Northern District of California

7

United States District Court
Northern District of California

namely, the text that states "Email address" and "Create password." *Cf. Patrick v. Running Warehouse, Inc.*, 93 F.4th 468, 477 (9th Cir. 2024) (approving of hyperlinked text designated by "bright green" font that was "the same color as other clickable links on the page, suggesting clearly that it is a hyperlink"). Viewed holistically, given these deficiencies, the Sign-Up Page did not give Plaintiff reasonably conspicuous notice of the terms of use or privacy policy.

The Facebook Userflow also fails to provide reasonably conspicuous notice, though it fares better than the Sign-Up Page. Again, the links to the "Terms of Use" and "Privacy Policy" are located at the bottom of the page. They are closer to the blue "Continue" button that the user must click to create an account, but they do not "disrupt[] the natural flow of actions" on the page. *Chabolla*, 129 F.4th at 1157. The top of the Facebook Userflow informs the user that Plex is requesting access to the user's profile picture and email address. The user can read this information and "Edit access" or click "Continue" without encountering the "Terms of Use" or "Privacy Policy." Additionally, the "Terms of Use" and "Privacy Policy" text appears in the smallest font of any text on the page, and it is much less prominent than the interactive elements of the page – the "Continue" and "Cancel" buttons.

Accordingly, the Court finds that Plex failed to provide Plaintiff reasonably conspicuous notice of the terms of service and privacy policy.[5] The lack of notice is dispositive, but the Court proceeds to address the second issue of assent for completeness.

### 3. Unambiguous manifestation of assent

"Reasonable conspicuousness alone is not sufficient to bind a user – a user must agree to the terms, not merely see them." *Chabolla*, 129 F.4th at 1158. A sign-in wrap agreement does not expressly require a website user to read the terms of use before proceeding to use the website, *id.* at 1154, so assent is typically manifested by another action, like clicking a button. However, "[a] user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions

---

[5] The Court recognizes that another court found that Plex's sign-up page provided reasonably conspicuous notice in *Miller v. Plex, Inc.*, No. 22-cv-05015-SVK, ECF No. 32 (March 30, 2023). The ruling was issued prior to the Ninth Circuit's opinion in *Chabolla*. For the reasons discussed above, the Court declines to follow *Miller*.

1  of an agreement." *Berman*, 30 F.4th at 857.  A website must use clear language to indicate what

2  action will bind the user to the terms.  *See id.* at 858 (holding that assent was lacking because the

3  webpage "did not indicate to the user what action would constitute assent").

4          Here, the Court finds that neither the Sign-Up Page nor the Facebook Userflow clearly

5  indicated to Plaintiff what action would constitute assent to the terms of service and privacy

6  policy.  Plex argues that a user assents to its terms on the Sign-Up Page by clicking the "Continue

7  with Facebook" button, Castro Decl. ¶ 10, but nothing in the notice language says this.  The notice

8  language at the bottom of the Sign-Up Page states:  "By creating an account or continuing to use a

9  Plex application, website, or software, you acknowledge and agree that you have accepted the

10  **Terms of Service** and **Privacy Policy**."  In context, this language is ambiguous because it

11  describes two actions that constitute assent, but neither matches the "Continue with Facebook"

12  button that Plaintiff clicked.  *See Berman*, 30 F.4th at 857 ("[M]erely clicking on a button on a

13  webpage, viewed in the abstract, does not signify a user's agreement to anything.").  First,

14  "creating an account" constitutes assent, but a reasonable user could assume this means clicking

15  the prominent "Create an Account" button that appears directly above the notice language.

16  Second, "continuing to use a Plex application, website, or software" constitutes assent, but the

17  button Plaintiff clicked "automatically" directed him to the Facebook website.  Castro Decl. ¶ 11.

18  Plaintiff did not continue to a Plex application, website, or software.[6]

19          The notice language on the Facebook Userflow also fails to indicate what action

20  constitutes assent.  The notice states:  "By continuing, Plex will receive ongoing access to the

21  information you share and Facebook will record when Plex accesses it."  The phrase "Plex's

22  Privacy Policy and Terms of Service" appears beneath this notice, but nothing connects these

23  terms to any action that the user takes on the Facebook UserFlow.

24          Finally, the fact that Plex provided links to the terms of service and privacy policy on both

25  the Sign-Up Page and the Facebook Userflow does not change the Court's conclusion.  The Court

26  considers "the visual aspects of every page of a multi-page transaction . . . together." *Chabolla*,

27

28  [6] "This notice defect could easily have been remedied by including language such as, 'By clicking the Continue >> button, you agree to the <u>Terms & Conditions</u>.'" *Berman*, 30 F.4th at 858.

United States District Court
Northern District of California

129 F.4th at 1155.  However, the Court will not find that a contract was formed by combining independently insufficient elements of notice and assent across several webpages.  *See id*. at 1158 ("We disagree that California's contract formation test can be met with broad reference to the conspicuousness of notice across three separate pages and a manifestation of assent constructed from three different action buttons."); *see also Quamina v. JustAnswer LLC*, 721 F. Supp. 3d 1026, 1040 (N.D. Cal. 2024) ("The obvious problem is that aggregating individually insufficient forms of notice does not somehow add up to a positive."), *appeal docketed*, *Godun v. JustAnswer LLC*, No. 24-2095 (9th Cir. Apr. 4, 2024).

Here, the Sign-Up Page fails to provide reasonably conspicuous notice of terms, so a typical user that creates a Plex account through Facebook never encounters the notice language at the bottom of the page.  Even if the user sees this language, it does not unambiguously describe what action will bind the user to Plex's terms.  When the user continues to the Facebook Userflow, the notice of the terms of use is more prominent, but there is no indication that, by clicking "Continue," the user will be bound by Plex's terms.  Thus, even when combined, the Sign-Up Page and Facebook Userflow do not satisfy the requirements for contract formation.

In sum, Plex has not demonstrated that it gave Plaintiff reasonably conspicuous notice of its terms of use, or that Plaintiff unambiguously manifested his assent to those terms.  The Ninth Circuit applies a comprehensive, fact- and context-specific inquiry when a website operator seeks to bind a user to a sign-in wrap agreement.  This inquiry may foster uncertainty for website operators in close cases.  *See Chabolla*, 129 F.4th at 1172 (Bybee, J., dissenting) (observing "great uncertainty in this area").  Legal rules should be clear and predictably applied so that businesses can order their affairs with confidence.  At the same time, website users should be able to predict when they will be bound by terms that may significantly alter their procedural and substantive rights.  Here, Plex's terms of use, if enforced, would affect Plaintiff's procedural right to litigate in court, as well as Plaintiff's important substantive right to privacy.

Ultimately, as a website operator, Plex controls its own destiny.  Plex could have employed several common website design elements to make its sign-in wrap agreement more enforceable.  The notice could be placed immediately above or beneath action items; the hyperlinks could be

United States District Court
Northern District of California

1    more clearly emphasized; and the language explaining the consequences of creating a Plex

2    account could be clearer.[7]  Because these important elements are lacking, Plex has not met its

3    burden to show the existence of an agreement to arbitrate.  Accordingly, Plex's motion to compel

4    arbitration is DENIED.

5    **III.      12(B)(2) MOTION TO DISMISS**

6              **A.      Legal Standard**

7              A defendant may move to dismiss a case for lack of personal jurisdiction under Federal

8    Rule of Civil Procedure 12(b)(2).  In opposing a Rule 12(b)(2) motion, the plaintiff has the burden

9    of establishing that jurisdiction is proper.  *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir.

10   2015).  "Where, as here, the defendant's motion is based on written materials rather than an

11   evidentiary hearing, 'the plaintiff need only make a prima facie showing of jurisdictional facts to

12   withstand the motion to dismiss.'"  *Id*. at 1073 (quoting *Brayton Purcell v. Recordon & Recordon*,

13   606 F.3d 1124, 1127 (9th Cir. 2010)).  The court must take uncontroverted allegations as true and

14   resolve conflicts over statements contained in affidavits in favor of the plaintiff.  *Id*.  However, the

15   court "may not assume the truth of allegations in a pleading which are contradicted by affidavit."

16   *Apple, Inc. v. VoIP-Pal.com, Inc.*, 506 F. Supp. 3d 947, 957 (N.D. Cal. 2020) (quoting *Mavrix*

17   *Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011)).  The court may also

18   consider "declarations and other evidence outside the pleadings to determine whether it has

19   personal jurisdiction."  *Id.* at 956.

20            "For the exercise of personal jurisdiction over a defendant, due process requires that the

21   defendant 'have certain minimum contacts' with the forum state 'such that the maintenance of the

22   suit does not offend traditional notions of fair play and substantial justice.'"  *Ranza*, 793 F.3d at

23   1068 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  "The strength of contacts

24   required depends on which of the two categories of personal jurisdiction a litigant invokes:

25   specific jurisdiction or general jurisdiction."  *Id*.

26   _____

27   [7] Although not required under Ninth Circuit law, using a clickwrap agreement would provide a
     website operator with greater assurance that the agreement will be enforced.  *Berman*, 30 F.4th at

28   856 ("[C]ourts have routinely found clickwrap agreements enforceable."); *see also Oberstein*, 60
     F.4th at 517 ("To ensure that an online agreement passes muster, clickwrap is the safest choice.").

A corporate defendant is subject to general jurisdiction in its place of incorporation and its principal place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). A defendant may also be subject to general jurisdiction if its affiliations with the forum state are "so continuous and systematic as to render [it] essentially at home in" that state. *Id.* at 139 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). A defendant is subject to specific jurisdiction if it (1) "purposefully availed itself of the privilege of conducting activities in" or "purposefully directed its activities toward" the forum state; (2) the claim "arises out of or relates to the defendant's forum-related activities"; and (3) the exercise of jurisdiction "comport[s] with fair play and substantial justice." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004); *see also Global Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir. 2020) (discussing the difference between purposeful availment and purposeful direction).

### B.    Discussion

Plaintiff fails to establish that Plex GmbH is subject to either general jurisdiction or specific jurisdiction in California. The only allegations that mention Plex GmbH state:

> Together with Plex GmbH, Defendant Plex, Inc. offers the interactive Plex streaming service throughout California and the United States.

> Defendant Plex GmbH is a Swiss corporation with its principal place of business . . . [in] Berlin, Germany. Plex GmbH oversees and controls the operations of Plex, Inc., and relies on its subsidiary, Plex, Inc., for access into, and delivery of video content and the sales of subscriptions into the United States on the Plex streaming service. As such, both Defendants acted jointly and in concert to commit the violations alleged herein.

Compl. ¶¶ 7-8. All other allegations in the complaint reference "Defendants" or "Plex" ambiguously without attributing any conduct to Plex GmbH specifically. This is improper. A complaint cannot "engage[] in undifferentiated pleading that fails to make clear what allegations are being made against" each defendant. *Beluca Ventures LLC v. Aktiebolag*, 622 F. Supp. 3d 806, 816 (N.D. Cal. 2022); *see also McHenry v. Renne*, 84 F.3d 1172, 1178 (9th Cir. 1996) (explaining that a complaint must clearly indicate "which defendants are liable to plaintiffs for which wrongs"). Plaintiff's allegations against "Plex" and "Defendants" do not satisfy Rule 8's

12

United States District Court
Northern District of California

1    notice requirement, and the Court will not rely on them.  *Resh, Inc. v. Skimlite Mfg. Inc.*,

2    666 F. Supp. 3d 1054, 1059 (N.D. Cal. 2023); *see also id*. at 1059-60 ("Defendants should not

3    have to guess amongst themselves as to whom" an allegation was intended to apply.").[8]

4         As to general jurisdiction, Plaintiff alleges that Plex GmbH is a Swiss corporation with its

5    principal place of business in Germany.  Compl. ¶ 8.  Of course, neither Switzerland nor Germany

6    is in the State of California.  Plaintiff's other option is to allege that Plex GmbH's affiliations with

7    California are "so continuous and systematic" that it is "essentially at home" here.  *Daimler AG*,

8    571 U.S. at 139.  In that regard, Plaintiff alleges that "Defendants . . . conduct substantial business

9    within the State of California."  Compl. ¶ 10.  Even if the Court could attribute this ambiguous

10   allegation to Plex GmbH specifically, it would not establish that Plex GmbH is subject to general

11   jurisdiction in California.  Exercising general jurisdiction over a corporation because it "engages

12   in a substantial, continuous, and systematic course of business" is "unacceptably grasping."

13   *Daimler AG*, 571 U.S. at 137-38.

14        As to specific jurisdiction, Plaintiff does not plausibly allege any facts permitting the Court

15   to infer that Plex GmbH purposefully availed itself of the privileges of conducting activities in

16   California, or that it purposefully directed its activities to California.  *See Schwarzenegger*, 374

17   F.3d at 802.  The sole allegation connecting Plex GmbH to California is that "Plex, Inc. offers the

18   interactive Plex streaming service throughout California" "together with Plex GmbH."  Compl.

19   ¶ 7.  This is another "undifferentiated pleading" that fails to attribute conduct to Plex GmbH

20   specifically.  *See Beluca Ventures LLC*, 622 F. Supp. 3d at 816.  The other allegation that

21   references Plex GmbH states that the company "oversees and controls the operations of Plex, Inc."

22   and relies on Plex, Inc. for "delivery of video content and the sales of subscriptions into the United

23   States."  Compl. ¶ 10.  This allegation, at most, establishes that Plex GmbH directs some activities

24   toward the United States generally, not toward California specifically.  Because Plaintiff fails to

25   plausibly allege purposeful availment or direction, the Court does not reach the other requirements

26   for specific jurisdiction.

27

28   _____

[8] Plaintiff disavows that Plex GmbH and Plex, Inc. are alter egos.  *See* Opp. at 11.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff argues that a defendant's leveraging of a state's commercial market satisfies the purposeful availment requirement. Opp. at 12. But Plaintiff does not plausibly allege that Plex GmbH has leveraged California's market. Comparing Plaintiff's allegations to the cases Plaintiff relies upon underscores this pleading deficiency. In *Will Co. v. Lee*, the foreign defendant "earned considerable revenue" from the forum market and chose to host its website within the forum market to appeal to viewers there. 47 F. 4th 917, 924 (9th Cir. 2022). And in *Mavrix Photo*, the foreign defendant "operated a very popular website with a specific focus on the California-centered celebrity and entertainment industries." 647 F. 3d at 1230.

Accordingly, Plex GmbH's motion to dismiss for lack of personal jurisdiction is GRANTED. It is unclear whether Plaintiff can plausibly allege that Plex GmbH is subject to personal jurisdiction in California in light of Plex's declaration addressing jurisdictional facts. *See* Spenillo Decl., ECF No. 22-1. However, as this is the Court's first ruling on the legal sufficiency of Plaintiff's allegations, dismissal is with leave to amend.

## IV.    12(B)(6) MOTION TO DISMISS

### A.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To avoid dismissal, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the pleaded facts allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For purposes of a Rule 12(b)(6) motion, the court generally "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, the court need not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)).

1    If the court finds that dismissal pursuant to Rule 12(b)(6) is warranted, the "court should

2    grant leave to amend even if no request to amend the pleading was made, unless it determines that

3    the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203

4    F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quoting *Doe v. United States*, 58 F.3d 494, 497

5    (9th Cir. 1995)).

6    **B.    Discussion**

7        **1.    Consent**

8        Plex moves to dismiss both the VPPA and the California Civil Code § 1799.3 claims on

9    the grounds that Plaintiff consented to the disclosure of his video viewing activities.  Mot. at

10   13-18.  The VPPA provides that "a video tape service provide may disclose personally identifiable

11   information" "to any person with the informed, written consent . . . of the consumer" if certain

12   notice conditions are met.  18 U.S.C. § 2710(b)(2)(B).  Specifically, the informed written consent

13   must be "in a form distinct and separate from any form setting forth other legal or financial

14   obligations of the consumer," and must provide the consumer with a "clear and conspicuous

15   manner" to "withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the

16   consumer's election."  *Id*.  Section 1799.3(a) also requires "written consent" for disclosure of "any

17   personal information or the contents of any record, including sales or rental information, which is

18   prepared or maintained by that person."

19       Plex argues that Plaintiff consented to disclosure of his information "by proceeding to sign

20   up with Plex."  Mot. at 18.  However, as discussed above, Plex's website did not provide

21   reasonably conspicuous notice of the terms of service or privacy policy, and Plaintiff did not

22   unambiguously manifest his assent to be bound by them.  *See supra* Section II.B.  This is fatal to

23   Plex's argument that Plaintiff consented to disclosure of his video viewing activities.[9]

24   

25   _____

     [9] Plex's argument as to consent under VPPA fails for the additional reason that Plex did not seek

26   consent "with a consent form dedicated *solely* to informing consumers of [its] intent to share their
     personally identifiable information with Facebook."  *Cappello v. Walmart Inc*., No. 18-cv-06678-

27   RS, 2019 WL 11687705, at *2 (N.D. Cal. Apr. 5, 2019); *see also id*. ("[T]he plain language of the
     VPPA does indeed require video tape service providers to [] request consumers' consent to a

28   privacy disclosure that addresses only the use of personally identifiable information connected
     with video purchases and no other privacy topic[.]").

United States District Court
Northern District of California

Plex argues that the "Facebook Userflow explicitly put Plaintiff on notice that it could collect, use, and/or transmit Plaintiff's personal information to Facebook/Meta." Mot. at 18. But the Facebook Userflow discloses only that Plex needed access to Plaintiff's "name and profile picture and email address," and that "Plex will receive ongoing access to the information you share and Facebook will record when Plex accesses it." *See* Fig. 2. This notice indicates that *Plex* will receive information that *Plaintiff* shared with Facebook – not that *Facebook* will receive Plaintiff's viewing activity from *Plex*. Indeed, nothing in this supposed notice reflects what "information" is being shared with Plex or Facebook.

Accordingly, the Court denies Plex's motion to dismiss the VPPA and Section 1799.3 claims on the basis that Plaintiff consented to Plex's alleged disclosures of his viewing activity.

### 2.    Disclosure of personally identifiable information

Plex moves to dismiss Plaintiff's VPPA and Section 1799.3 claims for failure to allege that Plex disclosed Plaintiff's personally identifiable information. Mot. at 21 n.3; *see also Mollett v. Netflix, Inc*., 795 F.3d 1062, 1066 (9th Cir. 2015) (stating the elements of a VPPA claim, including the disclosure of personally identifiable information); Cal. Civ. Code § 1799.3(a) (prohibiting disclosure of "personal information"). The Ninth Circuit has held that "'personally identifiable information' means only that information that would 'readily permit an ordinary person to identify a specific individual's video-watching behavior.'" *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (quoting *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 267 (3d Cir. 2016)). Personally identifiable information includes information that "standing alone, identifies a person" as well as information that is "capable of" identifying a person. *Id*. at 984.

Here, Plaintiff alleges that Plex disclosed his Facebook User ID and his email address, along with "event data, like the title of the videos viewed." Compl. ¶¶ 43-44, 66, 82. Plaintiff further alleges that a "Facebook ID is personally identifying" because "[a]nyone can identify a Facebook profile – and all personal information publicly listed on that profile." *Id.* ¶ 42. Plaintiff also alleges that his Facebook profile "exists using his real name." *Id.* ¶ 6. Thus, any person who obtains Plaintiff's Facebook ID could locate his Facebook profile and, thereby, learn his name. These facts plausibly allege the disclosure of Plaintiff's personally identifiable information.

*See Eichenberger*, 876 F.3d at 986 (recognizing that names qualify as personally identifiable information under the VPPA).

The Ninth Circuit has acknowledged that a "Facebook link or an email address may very well readily enable an 'ordinary person' to identify an individual," but has not definitively ruled on this issue. *Id.* at 986. However, "[m]ost, if not all, courts to address the question have found at the pleading stage that Facebook IDs are [personally identifiable information]." *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 720 (N.D. Cal. 2023).

Consistent with the great weight of authority, this Court agrees that a Facebook ID is personally identifiable information for purposes of the VPPA because Plaintiff alleges that anyone can use it to identify a Facebook profile "and all personal information publicly listed on that profile." *See Ade v. Viki, Inc.*, No. 23-cv-02161-RFL, 2024 WL 1880153, at *2 (N.D. Cal. Mar. 28, 2024) (Plaintiff plausibly alleged that a Facebook ID is personally identifiable information because it "uniquely identifies an individual's Facebook account," "which generally contains a wide range of demographic and other information[.]" (citation omitted)); *see also Fan v. NBA Props. Inc.*, No. 23-cv-05069-SI, 2024 WL 1297643, at *2 (N.D. Cal. Mar. 26, 2024) (Plaintiff plausibly alleged that a Facebook ID is personally identifiable information because it "allows anybody" to identify a person associated with a Facebook profile and "all personal information publicly listed on that profile." (citation omitted)); *Sellers v. Bleacher Rep., Inc.*, No. 23-cv-00368-SI, 2023 WL 4850180, at *4 (N.D. Cal. July 28, 2023) ("The [Facebook ID] is a unique identifier that is enough, on its own, to identify a person."); *Jackson v. Fandom, Inc.*, No. 22-cv-04423-JST, 2023 WL 4670285, at *4 (N.D. Cal. July 20, 2023) (similar); *Stark v. Patreon, Inc.*, 635 F. Supp. 3d 841, 853 (N.D. Cal. 2022) (similar).

Plex argues that more is required. According to Plex, Plaintiff must also allege that his Facebook profile is public and that it contains personally identifiable information ("PII"). But, as noted above, most courts have not required plaintiffs asserting VPPA claims to plead such granular details. *Ghanaat* is one exception. In that case, the court held that a Facebook ID "can constitute PII where it leads to a Facebook page that discloses personal and identifying information about the consumer." 689 F. Supp. 3d at 720. The court found that the plaintiffs'

United States District Court
Northern District of California

allegations were "inadequate because they do not allege their Facebook pages contain any personal information, such as their names or email addresses." *Id.* Here, even if the Court were to adopt this requirement, it would be satisfied because Plaintiff alleges that his Facebook page "exists using his real name." Compl. ¶ 6. Thus, disclosure of Plaintiff's Facebook ID also discloses his name.[10] *See Eichenberger*, 876 F.3d at 986 (indicating that a person's name is personally identifiable information).

Plex asks the Court to take judicial notice of two online articles published by Facebook which, according to Plex, establish that a Facebook ID does not personally identify a Facebook user. Plex's First Supp. Br. at 4 & nn.2-4, ECF No. 35. But the Court cannot take judicial notice of disputed facts in online articles for the purpose of creating a defense against the well-pleaded allegations in the complaint. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). Moreover, contrary to Plex's characterization, one of the articles explains that "Your User ID is a string of numbers that doesn't personally identify you *but does connect to your Facebook profile* and specific chats on Messenger." *See* Facebook, *How usernames and user IDs are used on Facebook profiles*, https://www.facebook.com/help/211813265517027 (last visited Mar. 26, 2025) (emphasis added). The article elaborates that a User ID allows others "to see [a user's] Facebook profile, including any public information" and serves as "the web address for your profile or Page (example: Facebook.com/**yourname**)." *Id.* When viewed in full context, this article bolsters the Court's conclusion that a Facebook ID is personally identifiable information because it is "capable of" identifying a Facebook user. *Eichenberger*, 876 F.3d at 984.

Accordingly, Plaintiff plausibly alleges that Plex disclosed his personally identifiable information. Plex's motion to dismiss on this basis is DENIED.[11]

---

[10] The disclosure of Plaintiff's name also distinguishes this case from *Heerde v. Learfield Communications, LLC*, on which Plex relies. *See* 741 F. Supp. 3d 849 (C.D. Cal. 2024). In *Heerde*, the plaintiff alleged disclosure of his Facebook ID only, not additional information like his name. *Id.* at 857.

[11] Plex's motion to dismiss Plaintiff's Section 1799.3 claim on this basis fails for same reasons. *See, e.g.*, *Fan*, 2024 WL 1297643, at *2.

### 3.   Class action waiver

Finally, Plex argues that the Court should dismiss the case because "[a]t the time Plaintiff initially entered into the Sign-In Wrap Agreement in or around April 2020, Plex's TOS [terms of service] included a Class Action Waiver which bars his claims."  Mot. at 22.  However, Plaintiff did not agree to Plex's terms of service because Plex did not give reasonably conspicuous notice, and Plaintiff did not unambiguously manifest his assent to be bound by them.  *See supra* Section II.B.  Because Plaintiff did not agree to Plex's terms of service, he is not bound by the class action waiver contained within those terms.

Accordingly, Plex's motion to dismiss on this basis is DENIED.

## V.   MOTION TO STRIKE CLASS ALLEGATIONS

### A.   Legal Standard

Under Rule 12(f), a party may move to strike "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  The purpose of a motion to strike is to avoid wasteful litigation of "spurious issues."  *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010).  Therefore, a "motion to strike should only be granted if the matter sought to be stricken clearly has no possible bearing on the subject matter of the litigation."  *Baton v. Ledger SAS*, 740 F. Supp. 3d 847, 872 (N.D. Cal. 2024).

A decision to grant a motion to strike class allegations at the pleading stage is the "functional equivalent of denying a motion to certify a case as a class action" before discovery commences.  *Bates v. Bankers Life & Cas. Co.*, 848 F.3d 1236, 1238 (9th Cir. 2017) (per curiam) (quoting *In re Bemis Co.*, 279 F.3d 419, 421 (7th Cir. 2002)).  The Ninth Circuit has recognized that "often the pleadings alone will not resolve the question of class certification and that some discovery will be warranted."  *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009).  Thus, in general, "the better and more advisable practice for a District Court to follow is to afford the litigants an opportunity to present evidence as to whether a class action [i]s maintainable."  *Id.* (quoting *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1313 (9th Cir. 1977)).  But when the problem with the class allegations is "facially evident, it makes sense to address the issue early on."  *Baton*, 740 F. Supp. 3d at 883.

**B.    Discussion**

Plaintiff seeks to represent the following class:

> All persons in the United States who have a Facebook account and created a Plex account, or signed in to Plex, with a Google, Facebook, or Apple account and viewed videos on watch.plex.tv using the same browser they use to access their Facebook account until March 2, 2024 (the "Nationwide Class").

Compl. ¶ 69.  Plaintiff also seeks to represent an otherwise-identical subclass of all persons in the State of California.  *Id.* ¶ 70.  Plex moves to strike the class allegations on three primary grounds.

First, Plex argues that Plaintiff cannot represent a class because he lacks standing.  Mot. at 19.  To the extent Plex means that Plaintiff lacks standing to pursue his individual claims, this argument fails given the Court's ruling above that Plaintiff plausibly alleges claims under VPPA and California Civil Code § 1799.3.  *See supra Section* IV.B.  Plex also argues that Plaintiff lacks standing to represent a class that includes members who created their Plex accounts with a Google or Apple account because Plaintiff created his Plex account through Facebook instead.  *See* Mot. at 19.  But whether putative class members signed up using Facebook, Google, or Apple does not affect Plaintiff's standing as a class representative.  Plaintiff is asserting the same essential legal claims as the proposed class:  that Plex violated his privacy rights by sharing his viewing activity without consent.  If anything, the different sign-up methods raise questions for class certification, such as whether Plaintiff is typical of the class, and whether differences in sign-up methods create individualized issues that will predominate over common ones.  *See Melendres v. Arpaio*, 784 F.3d 1254, 1262 (9th Cir. 2015) ("[A]ny issues regarding the relationship between the class representative and the passive class members – such as dissimilarity in injuries suffered – are relevant only to class certification, not to standing." (quoting Newberg on Class Actions § 2.6)).  It would be premature to address these issues at the pleading stage, without discovery.

Second, Plex argues that individualized issues may predominate because individual proof will be needed to assess each class member's claim.  *See* Mot. at 20-21.  Plex argues that each class member "had different personal information allegedly compromised" and "each class member will need to provide individual proof [that] their 'Facebook profile is publicly accessible and includes sufficient identifying information.'"  Mot. at 20 (quoting *Heerde*, 741 F. Supp. 3d at

United States District Court
Northern District of California

857).  This argument is raised prematurely.  Plaintiff is entitled to discovery to determine whether he can show disclosure of class members' personally identifiable information through common proof.  *See Vinole*, 571 F.3d at 942.  At this early stage, the Court has no basis to conclude that Plaintiff's task is impossible.  For example, records in the possession of Plex (or Meta) may reflect class members' Facebook profile privacy settings and what information was (allegedly) shared by Plex to Meta.

Finally, Plex argues that Plaintiff cannot certify a class under Rule 23(b)(1) or 23(b)(2). Mot. at 20-21.  This argument is confusing and irrelevant.  A class may be certified if any one of the three Rule 23(b) requirements is met.  *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union v. ConocoPhillips Co.*, 593 F.3d 802, 805 n.4 (9th Cir. 2010) ("[T]he three provisions of Rule 23(b) are disjunctive:  a class can be certified where it satisfies only one Rule 23(b) requirement.").  In this case, the complaint does not invoke Rule 23(b)(1) or (b)(2).  Instead, Plaintiff alleges that the class may be certified under Rule 23(b)(3), which requires Plaintiff to demonstrate that common issues will predominate over individualized ones and that a class action is superior to other methods of adjudicating the controversy.  Compl. ¶¶ 74, 77; *see also* Fed. R. Civ. P. 23(b)(3).  As discussed above, the Court finds that it would be premature to strike Plaintiff's class allegations on the basis of hypothetical individualized issues.

Accordingly, Plex's motion to strike class allegations is DENIED.

## VI.    MOTION TO TRANSFER

Plex makes one final motion in the alternative – to transfer this case to the District of Delaware.  The premise of this motion is that if Plex's updated terms of service from 2024 apply to this case, then the forum selection clause identifying Delaware as the agreed-upon forum for certain disputes would apply.  This argument is confusing because all parties agree that, if the Court should apply any terms of service, it should apply the 2020 terms, not the 2024 updated terms.  Mot. at 25 (stating that the 2020 terms of service should apply because "Plex did not notify its existing users, including Plaintiff, of the April 11, 2024 update to its TOS" (citing Castro Decl. ¶ 42)); Opp. at 10 ("As Defendants concede the 2024 terms do not apply[.]").  Given Plex's declaration that it did not notify Plaintiff or other users of the 2024 update to its terms of service,

United States District Court
Northern District of California

the Court finds that Plaintiff did not have notice of the change in contract terms.  Therefore, Plaintiff cannot be bound by the forum selection clause in the 2024 updated terms.[12]  *See Stover v. Experian Holdings, Inc.*, 978 F.3d 1082, 1086 (9th Cir. 2020).

Accordingly, Plex's motion to transfer is DENIED.

## VII.    CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1.   Plex's motion to compel arbitration is DENIED.

2.   Plex's motion to dismiss Plaintiff's claims against Plex GmbH for lack of personal jurisdiction is GRANTED with leave to amend.

3.   Plex's motion to dismiss for failure to state a claim is DENIED.

4.   Plex's motion to strike class allegations is DENIED.

5.   Plex's motion to transfer is DENIED.

Plaintiff shall file an amended complaint within 21 days of this Order.

**IT IS SO ORDERED.**

Dated: March 28, 2025

_____
Eumi K. Lee
United States District Judge

---

[12] With respect to the 2020 terms, as previously discussed, the Court finds that they are not binding on Plaintiff because Plex did not provide reasonably conspicuous notice of the terms, and Plaintiff did not unambiguously manifest his assent to be bound by them.  *See supra* Section II.B.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**APPENDIX**

**Figure 1: Sign-Up Page (Castro Decl. Ex. C, ECF No. 22-5)**



1

**Figure 2: Facebook Userflow (Castro Decl. Ex. D, ECF No. 22-6)**

